**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
VIAMEDIA, INC.                                            :   Case No.: 1:20-cv-4064
                                                          :
                        Plaintiff,                        :
                                                          :   **COMPLAINT**
        v.                                                :
                                                          :
                                                          :
                                                          :
WIDEOPENWEST FINANCE, LLC                                 :
                                                          :
                        Defendant.                        :
                                                         ::
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Viamedia, Inc. ("Viamedia") by its attorneys K&L Gates LLP, for its complaint against Defendant WideOpenWest Finance, LLC ("WOW!") alleges as follows:

## NATURE OF THE ACTION

1. This dispute arises out of WOW!'s wrongful attempt to terminate its contract with Viamedia by changing the ground rules in the midst of the worst public health crisis in a century and the attendant economic crises caused by government ordered lock downs and stay at home orders.

2. Viamedia sells local TV advertising to local small businesses on behalf of cable TV companies (aka "MVPDs") such as WOW! in the markets where that cable TV operator provides cable TV subscriptions. Viamedia and WOW! have been partners since October 1, 2001. WOW! is currently Viamedia's largest supplier of cable TV advertising inventory availabilities, in which Viamedia has exclusive rights to sell WOW!'s cable TV inventory in return for which Viamedia

1

pays WOW! a revenue share and an annual minimum revenue guarantee. The current deal is governed by an Advertising Availability Purchase and Sale Agreement that was executed on December 28, 2015, as amended (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit A to the declaration of David Solomon ("Solomon Dec.").

3. Viamedia fully performed its obligations under the Agreement and all amendments, and WOW! received all revenue share payments and each Minimum Revenue Guarantee Amount to which WOW! was entitled for 2016, 2017, and 2018.

4. During that performance, the parties' course of dealing over more than two years established that WOW! would not treat any late payments as breaches of the Agreement, and further that the expected timing for revenue share payments was 30 days after the contractual due date ("Normal Course Date"). Viamedia relied on this Normal Course Dates in managing its cash flow.

5. In July of 2019, WOW! approached Viamedia to address certain financial issues facing WOW! by increasing WOW!'s total EBITDA (profits) for 2019. Specifically, WOW! requested that the Minimum Revenue Guarantee for 2019 be increased by $800,000. Viamedia agreed to this amendment, in an attempt to be a reasonable and cooperative commercial partner. In exchange, WOW! offered an extension of the agreement from December 27, 2020 until December 31, 2022 (the "July 2019 Amendment") as well as adding two other WOW! markets.

6. When the impacts of the Covid-19 pandemic emerged, Viamedia contacted WOW! for similar support and assistance given the crisis's toll on local small business advertisers, Viamedia, and the rest of the world. WOW! responded with aggressive and unreasonable demands

insisting on an immediate payment of an amount that WOW! now admits greatly exceeds any amount that might reasonably be owed.

7. When Viamedia refused to capitulate to those demands, WOW! commenced arbitration seeking to force certain payments.

8. Because there were several bona fide disputes regarding the amount owed, and the dates those amounts would become due, Viamedia agreed to arbitrate and suggested an arbitrator with experience in the telecommunication and media industries. However, in another effort to resolve the dispute commercially, Viamedia made a good faith payment to WOW! of approximately $200,000.

9. In response to that good faith gesture, WOW! sent Viamedia a notice of termination of the Agreement ("Notice of Termination"). That Notice of Termination, which alleges that Viamedia is insolvent, is based on nothing more than Viamedia's refusal to pay WOW! in the middle of a bona fide dispute as to the amounts owed and dates.

10. WOW! is using a pretext, in the middle of a global pandemic, to avoid its obligation to arbitrate on the merits and to escape the contractual extension it agreed to in exchange for an additional $800,000 in 2019 profits.

11. The termination is wrongful under New York law.

12. WOW!'s termination would cause Viamedia irreparable harm and would render any arbitration decision establishing Viamedia's rights and obligations ineffectual.

13. Accordingly, Viamedia is entitled to a temporary restraining order, a preliminary injunction, and such other relief as the Court deems appropriate.

## PARTIES

14. Viamedia is a Pennsylvania business corporation with a principal place of business at 220 Lexington Green Circle, Suite 300, Lexington, KY 40503.

15. Upon information and belief, WOW! is a Delaware limited liability company with its principal place of business at 7887 East Belleview Avenue, Suite 1000, Englewood, Colorado 80111.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C § 1332(a)(1) because the dispute is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17. The Court has personal jurisdiction over WOW! and venue is appropriate here because the parties have consented to arbitrate their dispute in New York City, New York and further agreed that the Agreement is governed by New York law. *See* Agreement, Section 5.1; *see also* 28 U.S.C. 1391.

## FACTUAL ALLEGATIONS

### I. Key Contractual Terms

18. There are five provisions of the Agreement that are directly relevant to this dispute: 1) the payment schedule for revenue shares; 2) the calculation of the Minimum Revenue Guarantee

4

3) the force majeure provision; 4) WOW!'s limited termination right; and 5) the dispute resolution provision.

### A. Timing Of Revenue Share Payments

19. Pursuant to the Agreement, Viamedia purchased local advertising "Availabilities," which grants Viamedia the right to sell local advertising on cable networks broadcast by WOW! in certain markets.  Agreement, Section 1.2.

20. Section 2.3 provides in relevant part that:

> As consideration for the Purchased Availabilities, Buyer shall pay to Seller monthly, on or before the last day of the third (3rd) calendar month following a Broadcast Month in which invoices are sent to advertisers or agencies during the Term, the amounts stated in Exhibit C of this Agreement.

21. Viamedia sends advertisers and agencies the invoices for each Broadcast Month the month after the advertising runs on the WOW! system.  For advertising that runs in November, for example, Viamedia invoices advertisers and agencies in December.

### B. Calculation of Minimum Revenue Guarantee

22. The Agreement established a Minimum Revenue Guarantee that WOW! will receive from the revenue share payments each year.

23. The Agreement also states that the Minimum Revenue Guarantee for a Broadcast Year shall be adjusted upwards or downwards if the total number of WOW! subscribers changes. If the number of subscribers increases, then WOW!'s Minimum Revenue Guarantee increases.  If the number of subscribers decreases, then WOW!'s Minimum Revenue Guarantee decreases. Given the degree of cord cutting in the cable industry, this adjustment has taken on a heightened degree of importance

24. In the event that the total revenue share payments for a Broadcast Year do not equal or exceed the Minimum Revenue Guarantee, Viamedia pays WOW! the difference.

C. Force Majeure

25. Section 4.3 provides:

Force Majeure: Notwithstanding anything in this Agreement to the contrary, neither seller nor Buyer shall have any liability or obligation to the other for any or omission caused, necessitated or prevented by any fire of casualty loss, acts of God, strikes, lockouts, war, civil unrest, acts of terrorism or other events beyond the reasonable ability of such Party to control.

D. Limited Termination Right

26. While the Agreement is not schedule to expire until December 31, 2022, Section 6.1 grants each party a limited termination right under two circumstances.

27. First, either party may terminate "if the other party is insolvent or bankrupt, or a petition is filed in any court of competent jurisdiction under the applicable bankruptcy law, including for liquidation or reorganization." Agreement, Section 6.1.

28. Second, a party may terminate upon 30 days written notice to the other upon the occurrence of a material breach, unless the breach is cured within those 30 days. *Id.*

E. Dispute Resolution

29. Section 5.1 provides that any "claim, controversy or dispute arising out of or relating to this Agreement, or the breach thereof, shall be resolved fully and finally by binding arbitration." The provision provides that the arbitration will occur in New York City, New York and that the interpretation and enforcement of the Agreement is subject to New York law.

30. Section 5.2 notes that "the Parties may cancel or terminate this Agreement in accordance with its terms and conditions without being required to follow the procedures set forth in this Section."

31. However, the Agreement explicitly memorializes the party's right to seek judicial intervention to preserve the status quo, stating that the "arbitration provision shall not limit the right of either party prior to or during any such dispute to seek, use, and employ ancillary, or preliminary or permanent rights and/or remedies, judicial or otherwise, for the purposes of maintaining the status quo until such time as the arbitration award is rendered or the dispute is otherwise resolved." Agreement, Section 5.1

32. The Agreement also ensures a prompt resolution of disputes, providing that the arbitration be conducted without discovery and requiring that a final award be issued within sixty days of the appointment of the arbitrator(s). *Id.*

33. Read together, Section 5 provides that: 1) the parties must arbitrate all disputes arising out of the agreement; 2) a party may terminate the agreement without utilizing arbitration; **but** 3) a party that believes the agreement was wrongfully terminated may seek injunctive relief preserving the status quo while the dispute is resolved in arbitration.

## II.     Course Of Dealing Regarding Revenue Share Payments

34. Since executing the Agreement, Viamedia has been a prudent and reliable commercial partner, and WOW! has received every penny to which it was entitled for the 2016, 2017, and 2018 Broadcast Years. Solomon Dec., ¶ 27. WOW! also received revenue share payments for the January 2019 through September 2019 Broadcast Months without issue. Solomon Dec., ¶ 28.

35. Over the course of that performance, the parties adopted a course of dealing for the acceptable payment timing for revenue share payments. Solomon Dec., ¶ 13-26. As reflected by the payment history, Viamedia routinely paid WOW! 30 or more days after the contractually mandated date. *Id.*

36. Until the onset of COVID-19, WOW! never objected to the timing of Viamedia's payments, and certainly never asserted that the payment schedule constituted a breach of the Agreement or evidence of insolvency. Solomon Dec., ¶ 26.

37. This is consistent not only with the course of dealing between WOW! and Viamedia, but also reflects the nature of the relationship between Viamedia and other cable companies like WOW! Solomon Dec., ¶ 21-25.

### III. Formal Amendment To The Agreement To Increase WOW!'s Accrued 2019 Revenue

38. In the second quarter of 2019, WOW! approached Viamedia to discuss amending the Agreement to increase the amount of accrued revenue (and therefore profits or EBITDA) that WOW! could report for their 2019 fiscal year. Solomon Dec., ¶ 29.

39. To assist its long-time commercial partner, Viamedia agreed to WOW!'s request to increase the Minimum Revenue Guarantee for the 2019 Broadcast year by $800,000. Solomon Dec., ¶ 30.

40. In exchange, WOW! agreed to add certain regions to the Agreement, and further agreed that the Agreement would be extended through December 31, 2022. *See* Solomon Dec, ¶ 31, Exhibit C (the "July 2019 Amendment").

41. The July 2019 Amendment provided that the Minimum Revenue Guarantee would be due on September 30, 2020, and further that the total payments due to WOW! for the 2020 Broadcast Year would be reduced by $800,000 so that the payment would effectively be a wash.

42. The July 2019 Amendment is silent as to how, precisely, the $800,000 reduction will be applied to the 2020 Broadcast Year, but Viamedia understood the agreement to reflect that the first $800,000 due for 2020 revenue share payments would be offset by the $800,000 that WOW! accrued in 2019 revenue.

### IV. WOW!'s Unreasonable And Unsupported Demands

43. After making the payment for September 2019 revenue share on March 6, 2020, Viamedia began planning for the unprecedented impacts of COVID-19. Solomon Dec., ¶ 34.

44. For example, the most valuable advertising opportunity in cable TV is live sporting events. Unlike nearly all other current television programming, these events are watched live rather than recorded, and therefore consumers do not fast forward through the advertisements. On or around March 11, 2020, all live sporting events were indefinitely postponed. This deflated the value of local cable TV advertising across industries. Solomon Dec., ¶ 35.

45. COVID-19 also had significant impacts on an industry-specific level. COVID-19 forced auto manufacturers to close plants and many dealerships to freeze sales. Many of these companies lacked any resources to advertise, and even those with some resources had more pressing priorities. Solomon Dec., ¶ 36.

46. Similarly, COVID-19 decreased political advertising insofar as it resulted in the postponement of many primaries which are typically large advertising revenue generators. Solomon Dec., ¶ 37.

47. Quick service restaurants and retailers are also prominent local advertisers, and those industries are among the hardest hit by the pandemic.

48. By the end of March, in evaluating this environment, Viamedia projected a potential 41% decrease in local advertising. Solomon Dec., ¶ 38.

49. However, Viamedia also projected an initial spike in advertising when the impacts of COVID-19 begin to subside—when, for example, businesses open, live sports return and political campaigns are back—and a return somewhat to normalcy by early fall. Solomon Dec., ¶ 39.

50. Accordingly, on April 9, 2020, Viamedia notified WOW!, first by phone and then via email, that Viamedia intended to defer one month's payment, i.e. the October 2019 revenue share payments. Viamedia was unequivocal that it was **seeking** to defer the payment, based on the belief that it would receive WOW!'s "support and assistance." Solomon Dec., ¶ 40, Exhibit D.

51. On April 13, 2020, WOW! responded with what amounts to the exact opposite of support and assistance.[1] WOW! claimed that Viamedia's deferral of one month's revenue share payment was "nonsensical" because, in WOW!'s mind, Viamedia owed WOW! **$2,447,310**. Solomon Dec., ¶ 41, Exhibit E.

52. On April 15, 2020, Viamedia's Chief Revenue Officer David Solomon and Chief Financial Officer Frank Connolly of Viamedia spoke with Vice President of Advertising Misty Jensen of WOW! Ms. Jensen sent an email summarizing that conversation and acknowledged that the $2,447,310 was inflated, i.e. that WOW! had no basis whatsoever to demand that amount. Solomon Dec., ¶ 42-42, Exhibit F.

53. Even with that corrected information, WOW! refused to confirm that WOW! was not asserting a material breach or triggering the notice and cure provision in the Agreement. Instead, WOW! demanded a payment of a different amount of $1,140,027.70, which WOW! believed to be due **by the next day**. *Id.*

54. On April 16, 2020, Viamedia agreed to a call between Mark Lieberman (Viamedia's Chief Executive Officer), David Solomon (Viamedia's Chief Revenue Officer), and Frank Connolly (Viamedia's Chief Financial Officer), and Bill Case, WOW!'s Interim Chief

---

[1] Notably, in rejecting Viamedia's suggestion, WOW! used virtually identical language to the language it now contends to be evidence of Viamedia's insolvency: "WOW is also suffering hardship and must take steps to protect its own customers and employees."

Executive Officer, WOW!'s Chief Marketing and Sales Officer Nancy McGee, and WOW!'s Vice President of Advertising Misty Jensen.  During that call, Mr. Case represented that: 1) WOW! did not intend for its April 13, 2020 letter to constitute a formal notice of breach; and 2) WOW! would not commence arbitration if Viamedia paid the October 2019 revenue share payment.  Solomon Dec., ¶ 45.

55. Based on those representations, Viamedia wired WOW! $396,808 that same afternoon.  Solomon Dec., ¶ 46.

56. On April 20, 2020, WOW! sent Viamedia by email a "Payment Plan" for the revenue share payments for November 2019, December 2019, and January 2020.[2]  Solomon Dec., ¶ 47, Exhibit G.

57. However, WOW!'s so-called payment plan came with an untenable caveat: "Irrespective of whether Viamedia agrees to this proposal, WOW! will continue to consider Viamedia in material breach of its payment obligations under that agreement unless and until Viamedia becomes current and due on all sums owed to WOW!"  *Id.*

58. As this directly contradicted the parties' conversation a few days earlier, Mr. Lieberman sent a clarifying letter to WOW, stating: "Unless WOW! informs us to the contrary, consistent with our conversation last Thursday, Viamedia will assume that Misty's statement in her April 20, 2020 letter was not intended by WOW! to serve as a formal notice of breach triggering the cure and dispute resolution procedures in the Advertising Agreement."  Solomon Dec., ¶ 49, Exhibit H.

59. WOW! never informed Viamedia to the contrary.  Solomon Dec., ¶ 50.

60. Instead, despite promising not to do so only a few days earlier, WOW! emailed Viamedia a demand for arbitration. That Demand for Arbitration makes two things clear: 1) WOW! intended to arbitrate the dispute as to the amount of money Viamedia owes WOW! and the dates that such payments become due; and 2) WOW! intended for Viamedia to "be mindful of [its] obligations under Section 5.3 of the Agreement to continue to provide products and services without interruption." Solomon Dec., ¶ 51, Exhibit I.

61. Consistent with WOW!'s Demand for Arbitration, Viamedia prepared to arbitrate the dispute and continued to provide products and services on WOW!'s behalf without interruption.

62. On May 15, 2020, despite WOW!'s insistence on resolving the disputed amounts via arbitration, Viamedia made a good faith payment of 50% of the November revenue share. Solomon Dec., ¶ 52.

63. On May 19, 2020, WOW! responded by serving a Notice of Termination based on Viamedia's alleged insolvency, and an "alternative" theory that WOW!'s April 13, 2020 letter should be treated as a notice of Material Breach (despite WOW!'s express and implied representations to the contrary). Solomon Dec., ¶ 53, Exhibit J.

64. On May 20, 2020, Viamedia's CEO wrote to WOW!'s CEO Teresa Elder (as Bill Case was no longer "Interim") to deny that Viamedia was insolvent and, as yet another gesture of good faith, offer to pay the outstanding balance of the November 2019 revenue share. Solomon Dec., ¶ 54, Exhibit K.

**V.    Immediate And Irreparable Harm**

65. WOW! is Viamedia's largest supplier of cable TV advertising inventory which accounts for more than 12% of Viamedia's revenue. Solomon Dec., ¶ 57.

66. Moreover, like almost every other business in the United States, Viamedia is navigating a changing landscape as a result of COVID-19. Solomon Dec., ¶ 58.

67. Viamedia is utilizing all resources available to it, and as a result is willing and able to honor all of its contractual obligations, provided that its counterparties do the same. Solomon Dec., ¶ 59.

68. However, if WOW! is allowed to proceed with its wrongful termination, its baseless assertion of Viamedia's insolvency may become a self-fulfilling prophecy.

69. Therefore, granting the requested preliminary injunction will ensure that any arbitration award that Viamedia may be entitled to will not be rendered ineffectual without such provisional relief.

70. At a minimum, the termination would dramatically alter Viamedia's financial situation and force Viamedia to make difficult decisions regarding its employees and the local businesses with which it works. Solomon Dec., ¶ 60.

71. Viamedia is a contract-based business and the current inventory deals in its pipeline would not come close to replacing the revenue that would be lost as a result of WOW!'s wrongful termination.

72. Moreover, the cable television industry has a relatively small number of major players, and WOW!'s termination of the Agreement will become known to most or all of those players. Solomon Dec., ¶ 61.

73. Upon information and believe, WOW! has already begun discussing its plans to replace Viamedia with another supplier of advertising services that serves in the same markets as Viamedia. Solomon Dec., ¶ 62.

74. If the industry believes that WOW! rightfully terminated the contract due to Viamedia's insolvency, that belief would impose incalculable and irreparable harm to Viamedia's reputation. Solomon Dec., ¶ 63-64.

75. Absent the requested preliminary injunction, Viamedia will suffer irreparable injury. Solomon Dec., ¶ 56-64.

76. Viamedia's wrongful termination would result in immeasurable harm in addition to monetary damages to Viamedia exceeding $20,000,000.

77. On the other hand, WOW! will not suffer any harm if the Agreement is not terminated. It has commenced arbitration against Viamedia and a final award will be issued in that arbitration in approximately sixty days.

78. As such, the balance of equities here tips decidedly in Viamedia's favor.

79. The public interest will not be harmed by the issuance of such provisional relief.

## CAUSES OF ACTION

### AS AND FOR THE FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

80. Viamedia incorporates the foregoing paragraphs as though fully set forth herein.

81. Viamedia and WOW! are parties to a binding contract, specifically the Agreement.

*82.* Viamedia has fully performed its obligations under the normal course of the Agreement.

*83.* Section 6.1 of the Agreement provides the parties limited termination rights only under two circumstances. First, either party may terminate "if the other party is insolvent or bankrupt, or a petition is filed in any court of competent jurisdiction under the applicable bankruptcy law, including for liquidation or reorganization." Agreement, Section 6.1. Second, a

party may terminate upon 30 days written notice to the other upon the occurrence of a material breach, unless the breach is cured within those 30 days. *Id.*

84. WOW! breached Section 6.1 by wrongfully terminating the Agreement without cause.

85. Viamedia has and will continue to suffer immediate and irreparable injury as a result of WOW!'s breaches.

86. Viamedia has suffered damages because of WOW!'s breaches in an amount to be determined at trial, but in no event less than $20,000,000, plus interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Viamedia, Inc. respectfully requests that this Court enter judgment in favor of Plaintiff as follows:

a. Issuing an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to prevent WOW! from terminating the Agreement during the pendency of this action and resolution of the parties' dispute through binding arbitration, to preserve the *status quo* and possibility of effective final relief, and to otherwise prevent irreparable harm;

b. Compensatory damages in an amount to be proven at trial;

c. Pre-judgment interest as provided by law;

d. Post-judgment interest as provided by law;

e. Attorneys' fees; and

f. Such other and further relief, at law or equity, to which Viamedia may be justly entitled.

Dated:   New York, New York
         May 27, 2020

                    By:   */s/ Luke E. Steinberger*
                             Luke E. Steinberger
                             Kodey M. Haddox
                             K&L Gates LLP
                             599 Lexington Avenue
                             New York, New York 10022
                             Tel.: 212.536.3900
                             Fax: 212.536.3901
                             Luke.Steinberger@klgates.com
                             Kodey.Haddox@klgates.com

                             *Attorneys for Viamedia, Inc.*

.