UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x
                                                            :
VIAMEDIA, INC.                                              :      Case No.  1:20-cv-4064
                                                            :
                                    Plaintiff,              :
                                                            :
                                                            :      **MEMORANDUM OF LAW IN**
            v.                                              :      **SUPPORT OF PLAINTIFF'S MOTION**
                                                            :      **FOR TEMPORARY RESTRAINING**
                                                            :      **ORDER AND ORDER TO SHOW**
                                                            :      **CAUSE WHY A PRELIMINARY**
WIDEOPENWEST FINANCE, LLC                                   :      **INJUNCTION SHOULD NOT BE**
                                                            :      **GRANTED**
                                    Defendant.              :
                                                            ::
                                                            :
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

FACTUAL BACKGROUND ...................................................................4

I.    Viamedia's Contractual Relationship With WOW! ........................4

II.   The Parties' Course Of Dealing ....................................................5

III.  The July 2019 Amendment ............................................................5

IV.  COVID-19.......................................................................................6

V.   WOW!'s Repeated Unauthorized Demands ..................................7

VI.  Bona Fide Disputes ......................................................................10

    A.    Minimum Revenue Guarantee ..........................................10

    B.    Contractual Payment Schedule .........................................11

    C.    Course of Dealing .............................................................11

    D.    The July 2019 Amendment $800,000 Offset .....................12

    E.    Force Majeure ...................................................................13

VII.  WOW's Purported Notice of Termination .....................................14

LEGAL STANDARD ...........................................................................16

ARGUMENT .......................................................................................17

I.    Viamedia Is Likely To Prevail On The Merits Of Its Claims........17

    A.    WOW!'s Assertion That Viamedia Is Insolvent Is Without Merit ......17

        1.    WOW!'s Termination Notice Is An Unlawful Attempt To Sidestep Its Obligation To Arbitrate Disputes Arising Out Of The Agreement ......17

        2.    WOW!'s Allegation Of Insolvency Is A Pretextual Excuse To Retract The Extension Granted In The July 2019 Amendment ......19

        3.    Viamedia's Refusal To Pay WOW! Pending The Arbitration Does Not Suggest, Let Alone Prove, Insolvency......22

    B.    At A Minimum, There Are Sufficiently Serious Questions Going To The Merits ......24

    C.    WOW! Has No Basis To Terminate For An Uncured Material Breach ......25

II.   Viamedia Will Suffer Irreparable Harm Without A TRO ...............28

III.  The Balance Of The Hardships Tip Decidedly In Viamedia's Favor......30

IV.  A TRO Would Not Harm The Public Interest ...............................31

CONCLUSION.....................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Company v. Performance Supply, LLC,*
   2020 WL 2115070 .................................................................................................28

*Acumen Re Management Corp. v. General Sec. Nat. Ins. Co.,*
   2012 WL 3890128 (S.D.N.Y. Sept. 7, 2012)........................................................12

*Ahlstrom Machinery Inc. v. Associated Airfreight Inc.,*
   251 A.D.2d 852 (3d Dep't 1998) ..........................................................................14

*In re Best Payphones, Inc.,*
   2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007), *aff'd,* 432 B.R. 46
   (S.D.N.Y. 2010), *aff'd,* 450 F. App'x 8 (2d Cir. 2011) ......................................25

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   910 F.2d 1049 (2d Cir.1990)................................................................................16

*Brookfield Asset Management Inc. v. AIG Financial Products Corp.,*
   2010 WL 3910590 (S.D.N.Y. Sept. 29, 2010)......................................................21

*Choctaw Generation Ltd. Partnership v. American Home Ins. Co.,*
   271 F.3d 403 (2d Cir. 2001)...........................................................................18, 19

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
   598 F.3d 30 (2d Cir. 2010)...................................................................................16

*In re Comp III, Inc.*
   136 B.R. 636 (S.D.N.Y.1992)................................................................................30

*Dice v. Inwood Hills Condominium,*
   237 A.D.2d 403 (2nd Dep't 1997) ........................................................................12

*Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.,*
   865 F.2d 513 (2d Cir. 1989).................................................................................25

*Five Star Development Resort Communities, LLC v. iStar RC Paradise Valley
   LLC,*
   2010 WL 1005169 (S.D.N.Y. Mar. 18, 2010) ......................................................27

*Frank Felix Associates, Ltd. v. Austin Drugs, Inc.,*
   111 F.3d 284 (2d Cir. 1987).................................................................................26

*In re Gordon Car and Truck Rental Inc.,*
   59 B.R. 956 (N.D.N.Y. 1985)................................................................................22

*Jacobson & Co., Inc. v. Armstrong, Cork Co.*,
    548 F.2d 438 (2d Cir. 1977)............................................................................23

*Janmort Leasing, Inc. v. Econo-Car Intern., Inc.*,
    475 F. Supp. 1282 (2d Cir. 1979) ..................................................................27

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
    588 F.2d 24 (2d Cir. 1978)............................................................................27

*Kenyon & Kenyon v. Logany, LLC*,
    33 A.D.3d 538 (1st Dep't 2006) ....................................................................12

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n,*
    *Inc.*,
    965 F.2d 1224 (2d Cir. 1992)........................................................................16

*Nemer Jeep-Eagle Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993)....................................................................27, 29

*Optima Media Group Ltd. v. Bloomberg LP*,
    2018 WL 1587074 (S.D.N.Y. Mar. 28, 2018) ........................................21, 23, 24

*PLanete Bleue Television Inc. v. AandE Television Networks, LLC*,
    2018 WL 10579873 (S.D.N.Y. Sept. 19, 2018)..............................................26

*Progressive Restaurant Systems, Inc. v. Wendy's Intern., Inc.*,
    1990 WL 106719 (N.D.N.Y. July 20, 1990) ..............................................26, 29

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir.2004)..........................................................................28

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990)..........................................................................17

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
    754 F.Supp.2d 616 (S.D.N.Y.2010)...................................................... *passim*

*Roso-Lino Beverage Distributors, Inc. v. The Coca-Cola Bottling Co. of NY*,
    749 F.2d 124 (2d Cir. 1984)....................................................................26, 28

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
    60 F.3d 27 (2d Cir. 1995)..............................................................................26

*Toyomenka Pacific Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*,
    771 F. Supp. 63 (S.D.N.Y. 1991) ..................................................................14

*Travellers Intern. AG v. Trans World Airlines, Inc.*,
    722 F. Supp. 1087 (S.D.N.Y. 1989)..............................................................12

*Winter v. Natural Resources Defense Council Inc.*,
   555 U.S. 7 (2008).................................................................................................................16

**Statutes**

NY Debtor and Creditor Law § 271 ............................................................................................21

## PRELIMINARY STATEMENT

Plaintiff Viamedia, Inc. ("Viamedia") seeks an immediate temporary restraining order to maintain the status quo with Defendant WideOpenWest Finance, LLC ("WOW!").   After more than 18 years of working together, the dispute came about, in the middle of the unprecedented COVID-19 health and economic crisis, after WOW! insisted that Viamedia accelerate payments beyond the pattern established in the normal course of years of dealing.  Shortly after representing it would not do so, WOW! initiated the contractually-required method of payment dispute resolution by commencing arbitration, only to change course again and send a Notice of Termination over a simple dispute about payment.

That Notice of Termination is ineffectual and meritless.  WOW! is attempting to terminate the Agreement, likely because it knows it will not prevail in an arbitration on the merits, by manufacturing a pretext that Viamedia must be insolvent because, and only because, Viamedia would not pay WOW! the incorrect amounts on the incorrect timeframe demanded by WOW!

By way of background, Viamedia was founded in 2001 and is the television industry's largest independent cable TV advertising management company selling and inserting commercials in the 2-3 minutes per hour in all of the cable networks offered by cable TV distributors to their cable subscribers in a particular geographic market.  Since June, 2002, Viamedia has purchased cable distributor WOW!s local cable television advertising availabilities.  Viamedia has 26 sales personnel in WOW!'s markets and has more than 58 operations personnel in Kentucky, and then sells  the  WOW! advertising availabilities  to local small businesses in WOW! markets  across the United States,  paying WOW! tens of millions of dollars over 18 years.  The parties entered into a new agreement in 2008, amended and extended the 2008 agreement three times, and entered into a new agreement on December 28, 2015 (the "Agreement").

That Agreement was amended in 2019. At that time, to address certain financial issues facing WOW!, Viamedia agreed to WOW!'s request to increase WOW!'s accrued revenue (and therefore EBITDA profit) by $800,000 in 2019, in exchange for a two-year extension of the agreement between the parties until December 31, 2022 ("the 2019 Amendment").

Then, in early March of 2019, as COVID-19 began its rapid and unprecedented expansion across the United States, and the attendant economic crises began severely impacting the local small businesses to whom Viamedia sells advertising, Viamedia expected WOW! to reciprocally act as a commercially reasonable partner.

But when Viamedia requested WOW!'s support, WOW! responded by demanding a payment in excess of $2,400,000—an inflated amount which WOW! later admitted significantly exceeded the amount it could demand under any contract interpretation.

Then, when Viamedia made a substantial good faith payment on the express representation that WOW! would not commence unnecessary and costly arbitration, WOW! responded by demanding that Viamedia capitulate to an unreasonable "Payment Plan" that, despite no longer seeking the outrageous $2,400,000, still sought substantial monies that WOW! was not entitled to.

A few weeks later, when Viamedia again made a good faith payment after WOW!'s demand for arbitration (despite WOW!'s previous express promise not to do so), WOW! responded by serving a Notice of Termination based on what WOW! arbitrarily categorized as Viamedia's insolvency.

WOW! was never entitled to a payment exceeding $2,400,000. WOW! was never entitled to the arbitrary Payment Plan it demanded. And WOW! is not entitled to terminate the Agreement because WOW! has no basis to suggest that Viamedia is insolvent.

2

WOW! is Viamedia's largest supplier of cable TV advertising inventory, and this wrongful termination in the middle of an unprecedented global pandemic would cause irreparable harm and jeopardize Viamedia's ability to continue operating.  On the other hand, WOW!—a company more than 10 times the size of Viamedia—would not be harmed during the pendency of the arbitration. Indeed, the Agreement requires all arbitrations to proceed expeditiously, with a final award issued within sixty days of the appointment of the arbitrators.   As such, the balance of the equities tip decidedly in Viamedia's favor.

Therefore, WOW!'s termination should be enjoined, and the status quo should be preserved for the duration of the arbitration, for at least three reasons.  First, WOW!'s termination is an inappropriate attempt to sidestep WOW!'s obligation to arbitrate payment disputes with Viamedia. There are bona fide disputes between WOW! and Viamedia regarding the amount owed under the Agreement, the date that payments became due and will become due in the future, the impact of a Agreement, and whether the dates for when the payment is due are excused due to the COVID-19 force majeure event.  All of these disputes must be arbitrated.

Second, even if WOW! were not required to arbitrate these issues with Viamedia, WOW! has no right to terminate based only on Viamedia's refusal to pay the amount that WOW! demands. New York courts routinely reject attempts to conflate **refusal to pay** with **inability to pay**, particularly where the unpaid amounts and timing are subject to a bona fide dispute.

Finally, Viamedia finds its very existence is at risk by WOW!'s improper termination of the Agreement whereas WOW!, a company with over a billion dollars in revenues, would suffer *de minimus* harm from temporary restraining order while the arbitration is pending.   Because the balance of the equities tip decidedly in Viamedia's favor, injunctive relief would be appropriate even if Viamedia were unable to prove it is likely to prevail on the merits.

Thus, Viamedia requests entry of a temporary restraining order, issuance of an order to show cause why a preliminary injunction should not issue, and payment of its fees and costs.

## FACTUAL BACKGROUND

**I.     Viamedia's Contractual Relationship With WOW!**

WOW! and Viamedia have been doing business together since 2001.  *See* Declaration of David Solomon, dated May 26, 2020 ("Solomon Dec."), ¶ 6.  The latest iteration of the agreement between the parties was executed on December 28, 2015.  *Id.*, ¶ 7, Exhibit A.   Pursuant to that Agreement, Viamedia purchased WOW's local advertising "Availabilities," which grants Viamedia the right to sell local cable TV advertising on cable systems owned by WOW! in certain markets.  *Id.*, ¶ 9.  In exchange, Viamedia pays WOW! a Purchase Price equal to  a percentage of Viamedia's Gross Revenues for each Broadcast Month (i.e. a monthly revenue share).  *Id.*, ¶ 10.  The Agreement also includes a Minimum Revenue Guarantee Amount that guarantees WOW! will receive a certain amount of money in each Broadcast Year (the "Minimum Revenue Guarantee").  If the total amount paid in monthly revenue share does not equal the Minimum Revenue Guarantee, Viamedia must pay the difference the following year.  *Id.*

The Agreement also includes a specific framework for the revenue share payments, stating that Viamedia will make each revenue share payment the last day of the third month after the month in which Viamedia sends invoices to advertisers.  For example, because the invoices for January are sent to hundreds of small business advertisers by Viamedia in February, the revenue share payment for January is sent on the last day of the third month after February, i.e. May 31.

The Agreement further provides that all disputes arising out of the Agreement must be submitted to binding arbitration, as acknowledged by WOW!'s Demand for Arbitration last month. While the dispute resolution clause includes a carve-out noting that parties can terminate the Agreement without commencing arbitration in certain instances, the same clause explicitly notes

that parties have the right to seek injunctive or other equitable relief to preserve the status quo while there is an arbitral dispute.  Viamedia is so seeking to maintain the status quo.

## II.      The Parties' Course Of Dealing

Viamedia has been a consistent and reliable commercial partner dating back to 2001, and has performed all of its obligations under previous agreements and, as most relevant here, under the Agreement.  Prior to the present dispute, WOW! has received all monies to which it was entitled, including the 2016, 2017, 2018 Broadcast Years.  *Id.*, ¶¶ 27-28.

Over that time period, the parties adopted a course of dealing for the acceptable payment timing for revenue share payments.  Dating back to the February 2017 Broadcast Month, on average, Viamedia paid WOW! the monthly revenue share 32 days after the contractual due date.  Solomon Dec., ¶ 15.  That trend has been consistent over the last several years.  For example, the revenue share payments for January 2018 through May 2018 were paid 28, 26, 38, 41, and 40 days after the contractual due date.  *Id.*, ¶ 18.  Likewise, from October 2018 through September 2019, each and every revenue share payment was made more than 30 days after the contractual due date.  *Id.*, ¶ 20.  WOW! never complained about this payment schedule.  Given this course of dealings, Viamedia understood the operative due date for revenue share payments to be at least one calendar month after the contract due date, and further understood that a deferred or delayed payment beyond one calendar month would not constitute a material breach.  *Id.*, ¶ 26.

## III.     The July 2019 Amendment

In the second quarter of 2019, WOW! approached Viamedia to discuss whether it would be possible to increase WOW!'s accrued EBITDA for 2019.   Solomon Dec., ¶ 29.  To assist its long-term commercial partner, Viamedia agreed to increase the Minimum Revenue Guarantee for the 2019 Broadcast Year by $800,000 and executed an amendment to the Agreement (the "2019 Amendment").  *Id.*, ¶ 30.  In exchange for the $800,000 in accrued 2019 revenue, the 2019

5

Amendment provided that the $800,000 increase would be offset by an $800,000 decrease in the amount due for the 2020 Broadcast Year.  Additionally, the 2019 Amendment added certain markets to the Agreement and extended the term from December 27, 2020 until December 31, 2022.  *Id.*, ¶¶ 31-33.

**IV.    COVID-19**

Like virtually all businesses in the United States, local advertising was heavily impacted by COVID-19 and the attendant economic crisis.  Solomon Dec., ¶¶ 34-38.  Between March 13, 2020 and March 29, 2020, every geographic area in which Viamedia operates on WOW!'s behalf was declared a disaster area.  The most valuable cable TV inventory from an advertising opportunity perspective is live sporting events, and all such events were cancelled on or around March 11, 2020.  *Id.*, ¶ 35.

The reduction in advertising opportunities coincided with a sharp decrease in revenue for the businesses that would typically advertise.  Business in the automobile industry, for example, makes up approximately 25% of Viamedia's revenue, but COVID-19 forced many manufacturers to close plants and many dealerships were not permitted by State government order to sell vehicles. *Id.*, ¶ 36.  Likewise, political advertising contributes approximately 35% of total revenue, but COVID-19 resulted in the postponement of primaries.    *Id.*, ¶ 37.  By the end of March, in evaluating this environment, Viamedia projected a 41% decrease in local advertising.  *Id.*, ¶ 38. However, Viamedia also projected an initial spike in advertising when the impacts of COVID-19 begin to subside—when, for example, businesses open, live sports return and political advertising is back closer to election day—and a return to some sense of normalcy by early fall.  *Id.*, ¶ 39.

With not only new ad campaigns but cash collections from previous campaigns from local small businesses impacted, Viamedia took a number of steps to minimize the impact of this unforeseeable and unprecedented event. Viamedia laid off and/or furloughed 7% of its staff,

senior management took compensation reductions, while the rest of the workforce saw their salary reduced for a period of time.   *Id.*, ¶ 34.  Viamedia also applied for, and received, a SBA-backed Payment Protection Program loan to maintain as much of its workforce as possible.  Viamedia also contacted its cable company partners to request support, understanding and assistance in the form of a modest deferral of payments.  On April 9, 2020, Viamedia's Chief Revenue Officer David Solomon, after having a telephone conversation with WOW!'s Vice President of Advertising Misty Jensen about the issue, emailed WOW! with just such a request.

> During these  unprecedented and uncertain times, Viamedia is looking at every option in adjusting to the realities of the current environment to allow us to remain steadfast in our commitment to our employees, advertisers and MVPD partners, both during the pandemic and the future, as we proactively look to meet the challenges that will remain after the pandemic has subsided.  To do so, we need your support and assistance.

> Our advertisers are predominately small businesses hard hit by COVID-mandated lockdowns.  Preliminary trends show a significant slowdown in collections in April of approximately 50%, and while we will not fully know the impact of cash collections going forward, Viamedia recognizes that it will need to work with these advertisers in structuring plans to meet their payment obligations to Viamedia, ensuring that Viamedia gets paid, and ensuring that Viamedia continues to grow its long term relationship with the advertiser and remain its advertising solution.

> In order to allow Viamedia the flexibility to address the challenges being faced by our advertisers, and to work together with those advertisers and with you to continue the successful business partnership we have enjoyed to date we will be deferring this month's payments to you.  We will contact you again toward the end of April when we have more information on collections trends.

Solomon Dec., ¶ 40, Exhibit D.

**V.    WOW!'s Repeated Unauthorized Demands**

WOW! did not provide Viamedia with any support, let alone assistance.  Instead, on April 13, 2020, WOW! sent a letter labeling Viamedia's request for support "nonsensical" and declaring that Viamedia was in material breach for accruing invoices totaling $2,447,310.  Solomon Dec., ¶ 41, Exhibit E.  To reach that number, WOW! asserted that the 2019 Minimum Revenue Guarantee

equaled $538,935, and further alleged that revenue share payments were due for October 2019, November 2019, December 2019, January 2020, and February 2020.

On April 15, 2020, Viamedia reminded WOW! via telephone call that there was a bona fide dispute regarding the Minimum Revenue Guarantee, and that there no basis whatsoever for the assertion that the December 2019, January 2020 and February 2020 revenue share payments were due on April 13, 2020.  Viamedia also requested confirmation that WOW! was not asserting that Viamedia's refusal to pay while the amounts remained disputed was a material breach of the Agreement, particularly in light of the COVID-19 pandemic.  Solomon Dec., ¶ 42.

WOW! responded the same day by email and acknowledged that its demand for the January 2020 and February 2020 revenue share payments was a mistake.  However, WOW! refused to engage in reasonable commercial discussions, instead demanding payment **within 24 hours** of the portion of Minimum Revenue Guarantee that was undisputed and the October 2019 and November 2019 revenue share payments.  WOW! also refused to state in writing that it did not intend for its April 13, 2020 letter to declare a material breach.   Solomon Dec., ¶ 43, Exhibit F.

The following day, on April 16, 2020, Viamedia agreed to a call between Mark Lieberman (its CEO), David Solomon (Viamedia's Chief Revenue Officer), and Frank Connolly (Viamedia's Chief Finance Officer), and Bill Case, WOW!'s Interim Chief Executive Officer[1], Nancy McGee, WOW!'s Chief Marketing and Sales Officer, and WOW!'s Vice President of Advertising Misty Jensen.  During that call, Mr. Case represented that: 1) WOW! did not intend for its April 13, 2020 letter to constitute a formal notice of breach; and 2) WOW! would not commence arbitration if

---

[1] Mr. Case was named Interim CEO while Teresa Elder, WOW!'s CEO, was on a leave of absence due to health reasons.

Viamedia paid the October 2019 revenue share payment.  Solomon Dec., ¶ 45, Exhibit E.  Based on those representations, Viamedia wired WOW! $396,808 that afternoon.  *Id.*, ¶ 46.

On April 20, 2020, four days later, WOW! sent Viamedia an arbitrary "Payment Plan" setting out a purported schedule for the November 2019, December 2019, and January 2020 revenue share payments.  Putting aside the fact that this plan ignored the $800,000 offset entirely, it came with an unacceptable caveat: "Irrespective of whether Viamedia agrees to this proposal, WOW! will continue to consider Viamedia in material breach of its payment obligations under that agreement unless and until Viamedia becomes current and due on all sums owed to WOW!" Solomon Dec., ¶ 47-48, Exhibit G.  In other words, WOW! asked Viamedia to pay part of a disputed amount while reserving WOW!'s position that Viamedia was in material breach for not paying the full disputed amount.  Because this commercially absurd proposition directly contradicted the express representations made verbally by WOW!'s CEO four days earlier, Viamedia memorialized that oral conversation.

Specifically, on April 20, 2020, Viamedia sent a clarifying letter to WOW! noting that Viamedia would not agree to WOW!'s conditions, but **would** endeavor to pay the November 2019 revenue share by May 15, 2020.  Solomon Dec., ¶ 49, Exhibit H.  More importantly, to avoid any confusion, Viamedia stated: "Unless WOW! informs us to the contrary, consistent with our conversation last Thursday, Viamedia will assume that Misty's statement in her April 20, 2020 letter was <u>not</u> intended by WOW! to serve as a formal notice of breach triggering the cure and dispute resolution procedures in the Advertising Agreement."  *Id.* Exhibit H.  WOW! never informed Viamedia to the contrary.  *Id.*, ¶ 50.

Instead, despite expressly representing that it would not do so, WOW! emailed Viamedia a formal Demand for Arbitration on April 22, 2020.  Solomon Dec., ¶ 51, Exhibit I.  That Demand

did not assert that Viamedia was in material breach.  To the contrary, it instructed Viamedia to "be mindful of [its] obligations under Section 5.3 of the Agreement to <u>continue to provide products and services without interruption</u>."  (Underlined added.)  Upon receipt of this Demand, Viamedia engaged outside counsel and prepared to arbitrate its disputes with WOW!

## VI.    Bona Fide Disputes

There are at least five bona fide disputes between WOW! and Viamedia regarding the amounts due under the Agreement, all of which will be presented to the arbitrator in due course as required by the Agreement.

### A.    Minimum Revenue Guarantee

WOW! is demanding $538,395.25 for the 2019 Minimum Revenue Guarantee, when the actual amount due is $346,570.  This dispute requires adjudication of Exhibit C to the Agreement, which sets forth a formula for the Minimum Revenue Guarantee due for each year.  Broadly speaking, the Minimum Revenue Guarantee will equal whichever is greater between: 1) the previous Broadcast Year's Gross Revenue, less 50% of revenue attributable to political advertising, multiplied by 97.5%, multiplied by the WOW!'s applicable share of Gross Revenues; or 2) a fixed amount per subscriber.  Viamedia and WOW! agree on the arithmetic for both options.  However, Exhibit C also includes the following language:

> If, as of the last day of any Broadcast year, the Average Number of Subscribers has increased or decreased by more than six and three-quarters percent (6.75%) from the Average Number of Subscribers as of the first day of any Broadcast Year, the [Minimum Revenue Guarantee] for the next Broadcast Year shall be adjusted upwards or downwards, as appropriate, by a percentage equal to a fraction, the numerator of which is the Average Number of Subscribers as of the last day of the expiring Broadcast Year, and the denominator of which is the Average Number of Subscribers as of the first day of the expiring Broadcast Year…

WOW! contends that, as evidenced by the two examples included in Exhibit C, this percentage reduction should only apply to the second calculation, i.e. the multiplication of a certain

dollar amount by the number of subscribers.  Viamedia contends that the plain language of the Agreement establishes that the **Minimum Revenue Guarantee shall be adjusted**, not that one of the possible for formulas should be.[2]  WOW! is fully aware that there is a legitimate dispute about the amount of the guarantee.  *See* Solomon Dec., ¶¶ 42-43.

  B. <u>Contractual Payment Schedule</u>

   Although WOW! has taken a number of different positions since the COVID-19 outbreak, its current position appears to be that revenue share payments for each Broadcast Month should be due three months later.  For example, WOW! asserts that the December 2019 revenue share payment became due on March 31, 2020.  Viamedia disagrees based on the plain language in the Agreement.  That language provides that revenue share payments shall become due on the last day of the third month **after invoices are sent** for a particular Broadcast Month.  The invoices for December 2019 were sent to advertisers in January of 2020.  Accordingly, revenue share payments would be due under this provision on the last day of the third month after January, i.e. April 30, 2020.  However, the parties' course of dealings over several years effectively amended that due date as set forth below.

  C. <u>Course of Dealing</u>

   The contractual schedule notwithstanding, Viamedia has been performing consistent with the parties' course of dealing for more than two years (both before and after the July 2019 Amendment).  Pursuant to that course of dealing, payments are typically made 32 days after the contractual due date, and delays longer than that are non-material.  This course of dealing estops

---

[2] During commercial discussions, WOW! placed great weight on the fact that a Viamedia employee sent WOW! an incorrect calculation on January 30, 2020 that applied WOW!'s interpretation.  However, when WOW requested that Viamedia prepare a clarifying amendment as to the Minimum Revenue Guarantee, Viamedia drafted an amendment that reflected the **correct** interpretation.  To the extent that WOW! suggests that Viamedia is bound by an interpretative error by one of its employees, that was promptly corrected before the 2019 Minimum Revenue Guarantee became due, WOW! is mistaken.

WOW! from demanding prompt payments for the first time in the middle of COVID-19, and from declaring delayed payments to be material for the first time in the history of the parties' long contractual relationship.  *See id.*, ¶¶ 13-28.

Viamedia anticipates that WOW! will point to language in the Agreement providing that failure to enforce rights does not constitute a waiver, and that the Agreement cannot be modified except in writing.  However, under New York law, non-waiver provisions can, themselves, be waived.  *Travellers Intern. AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989) (finding waiver despite no-waiver provision due to actions party took, including acceptance of contractual benefits for over a year following events that allegedly triggered right to terminate contract); *Acumen Re Management Corp. v. General Sec. Nat. Ins. Co.*, 2012 WL 3890128, at *6 (S.D.N.Y. Sept. 7, 2012) (finding waiver of right to receive quarterly reports despite no-waiver provision where "evidence overwhelmingly indicate[d] that Plaintiff failed to require performance of the quarterly report provision over a period of years"); *Kenyon & Kenyon v. Logany, LLC*, 33 A.D.3d 538, 539 (1st Dep't 2006); *Dice v. Inwood Hills Condominium*, 237 A.D.2d 403, 404 (2nd Dep't 1997) ("the existence of a nonwaiver clause does not in itself preclude waiver of a contract clause").  In any event, regardless of whether there was a formal waiver, WOW!'s treatment of "late" payments for over two years demonstrates that deferred payments here do not constitute a material breach.

### D.    The July 2019 Amendment $800,000 Offset

WOW! asserts that Viamedia owes the January 2020 revenue share payment.  This would be incorrect even without the July 2019 Amendment, as the contractual due date for January 2020 is May 31, 2020, and the actual due date given the parties' course of dealing is June 30, 2020. However, due to the July 2019 Amendment, the January 2020 revenue share payment is not due at all.  Viamedia added $800,000 to the 2019 Minimum Revenue Guarantee, and therefore to

WOW!'s 2019 reported revenue, and agreed to pay the 2019 Minimum Revenue Guaranty on September 30, 2020. In exchange, the amount due in revenue share payments for 2020 was reduced by $800,000. Because the January 2020 revenue share payment ($299,181.85) is less than $800,000, it is offset by the increase in 2019 revenue.

       E.    <u>Force Majeure</u>

Section 4.3 of the Agreement provides:

<u>Force Majeure</u>: Notwithstanding anything in this Agreement to the contrary, neither seller nor Buyer shall have any liability or obligation to the other for any or omission caused, necessitated or prevented by any fire of casualty loss, acts of God, strikes, lockouts, war, civil unrest, acts of terrorism or other events beyond the reasonable ability of such Party to control.

Viamedia attempted to work with WOW! to avoid the need to invoke a force majeure defense. Because WOW! refused to do so, Viamedia will argue in the arbitration that its delay in payment was caused and/or necessitated by COVID-19 and the attendant economic crises prompted by government ordered lock downs and stay at home orders, which qualify as both acts of God and/or events beyond the reasonable ability of Viamedia to control. To be clear, Viamedia is not asserting that COVID-19 means that Viamedia **does not need** to pay debts. Viamedia has never suggested that it has any intention of not paying WOW! the amounts to which WOW! is actually entitled. Instead, Viamedia intends to argue, among other things, that strict performance for the payment dates of the Agreement is excused due to the global pandemic, and that present circumstances are anything but "the ordinary course." Viamedia is confident that an arbitrator will recognize this distinction under New York law. *See, e.g., Ahlstrom Machinery Inc. v. Associated Airfreight Inc.*, 251 A.D.2d 852 (3d Dep't 1998) (explaining that a force majeure event excused **delay** in performance even though it did excuse performance altogether); *Toyomenka Pacific Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F. Supp. 63 (S.D.N.Y. 1991) (finding that

force majeure excused delayed performance in part because defendant ultimately performed despite the force majeure event).

## VII.   WOW's Purported Notice of Termination

On May 15, 2020, despite WOW!'s commencement of arbitration after explicitly promising not to do so, Viamedia took yet another step to show good faith.  Viamedia had no obligation to make any payment given the pending arbitration regarding the amounts owed, and little incentive to do so given WOW!'s constant backtrading and shifting positions.  Nevertheless, Viamedia wired WOW! $198,000, equaling 50% of the November 2019 revenue share payment. Solomon Dec., ¶52.

On May 19, 2020, WOW! responded to this good faith gesture by sending a Notice of Termination "due to Viamedia, Inc.'s insolvency."[3]  *Id.*, ¶ 53, Exhibit J.

The next day, counsel for Viamedia informed WOW!'s counsel that Viamedia was not insolvent and that Viamedia would seek emergency injunctive relief if WOW! did not withdraw its invalid Notice.  *See* Declaration of Luke Steinberger, dated May 26, 2020 ("Steinberger Dec."), ¶¶ 7-9.  Viamedia's CEO also emailed WOW!'s CEO Teresa Elder, emphasizing Viamedia's solvency, noting Viamedia's intention to seek injunctive relief if the Notice was not withdrawn, and offering to pay the outstanding balance of the November 2019 revenue share payment as a further indication of good faith.  *See* Solomon Dec., ¶ 54, Exhibit K.  In other words, Viamedia offered to pay the only undisputed amount that is due and owing under the Agreement given the parties' course of dealing.  WOW! rejected that offer.

---

[3] The Notice also stated: "Alternatively, as we indicated by letter dated April 13, 2020, Viamedia is in Material Breach of the Agreement for failure to pay and this letter serves as Notice of Termination under Section 6.1(a) of the Agreement."   As demonstrated below, this "alternative" basis is disingenuous.  WOW! expressly disclaimed any intention to trigger the notice and cure provision of Section 6.1(a) when it accepted $396,808.42 and Viamedia's summary of the parties' agreement that Section 6.1 was not triggered.

On May 21, 2020, WOW!'s counsel provided a summary of "WOW!'s basis for terminating based on Viamedia's insolvency."  This amounted to the three facts, none of which suggest insolvency.  First, WOW! correctly noted that Viamedia is refusing to pay a portion of the Minimum Revenue Guarantee before adjudicating the correct amount owed to WOW!  Second, WOW! pointed to certain conversations wherein Viamedia explained the impacts of COVID-19 and requested WOW!'s commercial cooperation.  Third, WOW! pointed to Viamedia's failure to pay WOW! the amounts WOW! (incorrectly) believe are owed on the schedule WOW! (incorrectly) believes apply.  *See* Solomon Dec., ¶ 55, Exhibit L.

On May 22, 2020, Viamedia's counsel conferred with WOW!'s counsel and emphasized that Viamedia's failure to pay amounts that are subject to a bona fide dispute that must be arbitrated does not grant WOW! a right to terminate under New York law.  Viamedia further reiterated that it would seek injunctive relief if WOW! did not withdraw the invalid Notice.  WOW!'s counsel acknowledged Viamedia's intention, noted that he had discussed same with his client, and confirmed that WOW! would not withdraw the Notice.  Steinberger Dec., ¶¶ 10-11.

On May 26, 2020, Viamedia's counsel provided WOW!'s counsel with drafts of the Complaint and Memorandum of Law filed in this action and stated Viamedia's intention to file same if WOW! did not withdraw its Notice of Termination.  *Id.*, ¶ 13.  Viamedia's counsel responded that afternoon and stated that WOW! terminated for insolvency because Viamedia "repeatedly refused to pay WOW the amounts contractually due and owing, and it refused to agree to or even discuss the terms of a payment plan."  *Id.*, ¶¶ 15-16, Exhibit C.  To avoid any pretext or confusion, Viamedia's counsel responded with a payment plan.  *Id.*, ¶ 17, Exhibit D.  Pursuant that Plan, "Viamedia will agree to pay the November 2019 revenue share immediately and to pay the December 2019 revenue share when it becomes due consistent with the parties' course of dealing,

i.e. on May 31, 2020.   Viamedia will also agree to a monthly payment plan for future Broadcast

Months consistent with that course of dealing, as adjusted pursuant to the $800,000 offset from

the July 2019 Amendment."   *Id.*   WOW!'s counsel responded that "WOW! cannot agree to

withdraw the notice of termination."   *Id.*, ¶ 21, Exhibit G.[4]

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tip in his favor, and that the injunction is in the public interest."   *Winter v.*

*Natural Resources Defense Council Inc.*, 555 U.S. 7 (2008).   In the Second Circuit, "standards

which govern consideration of an application for a temporary restraining order which are the same

standards as those which govern a preliminary injunction. . . ."   *Local 1814, Int'l Longshoremen's*

*Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). Moreover,

"[t]he standard for issuance of a preliminary injunction in aid of arbitration and issuance of a

preliminary injunction generally is the same."   *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.,* 754

F.Supp.2d 616, 621 (S.D.N.Y.2010) (citation omitted).   Those legal standards are well settled.

Moreover, "[f]or the last five decades, this circuit has required a party seeking a preliminary

injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2)

sufficiently serious questions going to the merits to make them a fair ground for litigation and a

balance of hardships tipping decidedly toward the party requesting the preliminary

relief."   *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d

---

[4] There was a considerable delay between WOW!'s receipt of Viamedia's payment plan and WOW!'s response that it would not discuss a payment plan.  WOW!'s counsel received the payment plan at 3:42pm.  He did not respond until 5:00pm, when he expressed his intention to "respond shortly."  Despite a chaser from Viamedia's counsel at 8:39pm, WOW!'s counsel did not respond until 9:21pm, over five and half hours after receipt of Viamedia's email and more than four hours after representing that WOW! would respond shortly.  Steinberger Dec., ¶¶ 17-21.

30, 35 (2d Cir. 2010) (internal citations omitted).  "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.  *Id.*

## ARGUMENT

**I.      Viamedia Is Likely To Prevail On The Merits Of Its Claims**

The sole issue at stake in this dispute is whether WOW! had a right to terminate the Agreement based on a disagreement between WOW! and Viamedia as to the interpretation of that Agreement.   In its Notice of Termination, WOW! purported to terminate the Agreement "due to Viamedia's insolvency."  Alternatively, WOW! alleged that Viamedia received a notice that it was in material breach on April 13, 2020, and failed to cure that material breach within 30 days.  As detailed below, Viamedia satisfies its burden to show that it is likely to prevail on the merits or, at a minimum, that sufficiently serious questions exist as to those merits.

A.      <u>WOW!'s Assertion That Viamedia Is Insolvent Is Without Merit</u>

Given the absence of evidence that WOW! has in support of its assertion of insolvency, WOW!'s termination on that basis is entirely without merit for three reasons.  First, the purported termination is an unlawful attempt to sidestep WOW!'s obligation to submit disputes under the Agreement to arbitration.  Second, the allegation of insolvency is a pretext to retract the contractual extension WOW! granted in exchange for $800,000 in 2019 revenue.  Finally, WOW!'s position that failure to pay a disputed amount is evidence of insolvency is untenable under New York law.

*1.    WOW!'s Termination Notice Is An Unlawful Attempt To Sidestep Its Obligation To Arbitrate Disputes Arising Out Of The Agreement*

By executing the Agreement, WOW! agreed to submit all disputes to binding arbitration. As detailed above, the dispute between Viamedia and WOW! simply cannot be characterized as a

failure to pay debts as they become due. Instead, the amount that Viamedia owes WOW! is heavily disputed. There are at least five contractual questions requiring adjudication.

- WOW! demands $538,395 for the 2019 Minimum Revenue Guarantee, when the contractual formula provides for $346,570;

- WOW! demands payment of revenue share payments for November 2019, December 2019, and January 2020, while the contract states that only November 2019 and December 2019 are due, and the parties' course of dealing establishes that only November 2019 is due.[5]

- WOW! purports that Viamedia's failure to pay the December 2019 revenue share is a material breach, while the parties' course of dealing over three years establishes that only a portion of the November 2019 revenue share is later than the ordinary course of business between the parties;

- WOW! prematurely demands payment of the January 2020 revenue share that is offset by the $800,000 in 2019 revenue WOW! received under the July 2019 Amendment; and

- WOW! demands accelerated payment in the midst of COVID-19, forcing Viamedia to reserve all arguments in arbitration, including the argument that **no payment is owed immediately** due to a force majeure event.

Each of these disputes requires interpretation of the Agreement and adjudication of the parties' rights pursuant to that interpretation. The Agreement requires all disputes arising out of the Agreement to be arbitrated, but authorizes a party to terminate without arbitration upon the other party's insolvency. Those clauses cannot meaningfully be read together to imply that WOW! can terminate the agreement for "insolvency" any time that there is a dispute under the Agreement as to the amounts owed.

In *Choctaw Generation Ltd. Partnership v. American Home Ins. Co.*, the plaintiff proffered an interpretation of its contract that would "place beyond the scope of arbitration the election by a

---

[5] Viamedia has established its ability to pay the outstanding November 2019 revenue share and the entirety of the December 2019 revenue share by offering to do exactly that, with November 2019 to have been paid immediately and the December 2019 payment to have been made on the due date established by the parties' course of dealing.

party asserting default to terminate the contract altogether."  271 F.3d 403, 408 (2d Cir. 2001).

The Second Circuit rejected that interpretation, labeling it "a reading that essentially nullifies the

otherwise broad gauge and detailed arbitration clause." *Id.*  The Second Circuit's guidance is clear:

WOW! cannot nullify the Agreement's arbitration clause by terminating the agreement based on

the existence of arbitrable disputes about payments.

>  2. *WOW!'s Allegation Of Insolvency Is A Pretextual Excuse To Retract The*
>     *Extension Granted In The July 2019 Amendment*

While WOW!'s attempt to sidestep its obligation to arbitrate is contractually prohibited, its

efforts to revoke the contractual extension border on nefarious.  In 2019, Viamedia provided

WOW! with $800,000 in 2019 revenue in exchange for, among other things, an extension of the

Agreement.  When Viamedia contacted WOW! for similar cooperation amidst the devastating

impacts of COVID-19, WOW! identified an opportunity to keep its $800,000 for free.

The pretextual nature of WOW!'s position is evidenced both by WOW!'s conduct for over

two years and by WOW!'s shifting demands since the outbreak of COVD-19.  Starting with the

revenue share payment for February of 2017, Viamedia has not made, and WOW! has not

demanded, a single revenue share payment by the contractual date.   Since that time, on average,

revenue share payments have been made 32 days after the contractual date. *See* Solomon Dec., ¶¶

13-28.  On eight separate occasions, Viamedia made revenue share payments more than 40 days

after the contractual date.  At a minimum, this course of dealing established that Viamedia would

not make, and WOW! would not expect, a revenue share payment until one full month after the

contractual date.  It also established that a payment more than one full month after the contractual

date would not be a material breach.  Remarkably, as the country began reeling from COVID-19,

WOW! demanded **for the first time** that payments be made immediately upon the contractual

date. *Id.*, ¶ 26.

Indeed, WOW! itself has seemed unsure as to its position as to what amounts are owed throughout this dispute.  WOW! initially demanded $2,447,310 on the theory that revenue share payments for every month up to and including February 2020 were due by March 30, 2020. Shortly thereafter, WOW! revised its position to state that $1,784,763.27 was due and owing, but that Viamedia could "show good faith to WOW! that it wants to be a good ad partner and continue conversations" if it made an immediate payment of $1,140,027.70.  When Viamedia refused to make that payment, WOW! represented that it would refrain from commencing arbitration if Viamedia paid the October 2019 revenue share.  However, when Viamedia paid that amount as a gesture of good faith, WOW! demanded arbitration.

As it begun the arbitration process, Viamedia stressed to WOW! that WOW! was incorrect as to the amount owed and the timing that such payments became due.  On the same day that WOW!'s counsel scheduled a call with Viamedia's counsel to discuss arbitration logistics, WOW! sent Viamedia a Notice of Termination, with the audacity to suggest that WOW! believed that the reason Viamedia had not paid WOW! was Viamedia's inability to do so.  In reality, WOW! itself seems unconvinced as to the amounts due and the appropriate payment schedule, and WOW! is more than aware that Viamedia intends to arbitrate the disputes surrounding those issues.  Most recently, in response to WOW!'s position that termination was necessary because Viamedia "refused to agree to or even discuss the terms of a payment plan," Viamedia proposed a payment plan to WOW! whereby Viamedia would pay the outstanding 50% of the November 2019 revenue share immediately and the entirety  of the December 2019 revenue share within five days. Steinberger Dec., ¶¶ 15-17.  Viamedia's proposed payment plan also included a commitment to pay make all future revenue share payments as they became due in accordance with the parties' course of dealing, subject to the $800,000 offset.  *Id.*

Between 2:40pm, when WOW!'s counsel sent its email, and 3:43pm, when Viamedia's counsel responded with a payment plan, WOW! somehow lost its willingness to "discuss the terms of a payment plan." Accordingly, WOW! responded that "WOW! cannot agree to withdraw the notice of termination" because "Viamedia is unwilling and unable to immediately pay the November and December 2019 revenue shares (both of which are past due under Viamedia's interpretation of the parties' agreement, and the amounts of which are undisputed), immediately pay the portion of the 2019 guarantee that is not in dispute, open its books for inspection to demonstrate its solvency to WOW's satisfaction, and otherwise provide concrete and meaningful assurances that Viamedia can and will make timely payments going forward according to the terms of the parties' agreement." *Id.*, Exhibit G. This statement is riddled with inaccuracies and baseless demands.

- Nothing about Viamedia's offer to pay the only amounts it believes to be due indicates an inability to pay the amounts that are due.

- The December 2019 revenue share payment **is not yet due** "under Viamedia's interpretation of the parties' agreement."

- WOW! has no right, under the Agreement, New York law, or common sense, to demand that Viamedia pay any portion of the disputed Minimum Revenue Guarantee before the arbitration (initiated by WOW!) determines that amount owed.

- WOW! has no right under the Agreement, which provides for a limited audit right that WOW! has not invoked and explicitly states that arbitration over disputes shall be conducted without discovery, to demand unfettered access to Viamedia's books; and

- Viamedia gave an explicit assurance that it would "make timely payments going forward according to the terms of the parties' agreement," as those terms are understood by Viamedia given the parties' course of dealing.

In sum, WOW!'s own conduct, both over the last two-plus years in establishing a course of dealing, and the last two months in presenting inconsistent demands for payment, has resulted

in Viamedia not making the payments that WOW! purports to be due. Without waiving its force majeure position, Viamedia unequivocally offered to pay the entire amount (exceeding $650,000) that will not be in dispute as of May 31, 2020. In exchange, Viamedia simply asked that WOW! withdraw its (baseless) Notice of Termination while the parties arbitrated the amount of the Minimum Revenue Guarantee, the impact of the $800,000 offset of 2020 revenue share payments, and the timing of future revenue share payments. Pursuant to Viamedia's understanding of the parties' rights and obligations, no payment for the Minimum Revenue Guarantee is due until the arbitrator adjudicates the amount due, and the January 2020 and February 2020 revenue share payments will be offset entirely by the $800,000 offset.[6] Accordingly, Viamedia's next revenue share payment will not be due until August 31, 2020.[7] Because an arbitration award must be rendered within 60 days of the appointment of the arbitrator, an award fully establishing the amounts owed will be rendered before the next revenue share payment is due. Against that backdrop, WOW!'s assertion that this failure to pay is evidence of insolvency strains credulity.

> 3. *Viamedia's Refusal To Pay WOW! Pending The Arbitration Does Not Suggest, Let Alone Prove, Insolvency*

As WOW! confirmed via email on May 21, 2020, WOW! has no basis for its purported conclusion that Viamedia is insolvent other than the fact that: 1) Viamedia has not paid the amount that WOW! incorrectly asserts is due; and 2) Viamedia acknowledged the financial impact of COVID-19.[8] This does not support WOW!'s termination under New York law for two reasons.

---

[6] A portion of the March 2020 revenue share payment will be offset as well.

[7] Three months after the month in which the March 2020 invoices are sent to advertisers (i.e. July 31, 2020) plus one calendar month pursuant to the parties' course of dealing).

[8] Viamedia notes that WOW!'s email was sent without prejudice, and does not suggest that WOW! is necessarily limited by the examples set forth therein. However, Viamedia is aware of no reason why WOW! would hide the ball if it had persuasive evidence, and further notes that no persuasive evidence can exist because Viamedia is not insolvent.

First, WOW! improperly conflates a refusal to pay with an inability to pay.  *See, e.g.,* *Optima Media Group Ltd. v. Bloomberg LP*, 2018 WL 1587074 (S.D.N.Y. Mar. 28, 2018) ("The time-honored meaning of insolvency, in the absence of a statute specifying another meaning, is **inability** to meet obligations as they mature in the ordinary course of business.") (emphasis added). In *Brookfield Asset Management Inc. v. AIG Financial Products Corp.*, the court clarified the distinction:

> "Fails to pay debts as they come due" and 'is unable to pay its debts as they become due' are not necessarily congruent.  'Fails to pay' leaves open the possibility that the entity has the resources to pay its debt, but is choosing not to, for whatever reason.  "Unable to pay" speaks of a lack of resources, and connotes inability and impossibility.

2010 WL 3910590 (S.D.N.Y. Sept. 29, 2010).  Moreover, although this dispute is governed by the common law definition of insolvency, New York's statutory definition of insolvency is instructive. *See* NY Debtor and Creditor Law § 271.  That statute provides in relevant part that a "debtor that is generally not paying the debtor's debts as they become due **other than as a result of a bona fide dispute** is presumed to be insolvent." *Id.* (emphasis added).  Here, as noted above, Viamedia is not paying the amounts in question as a result of a bona fide dispute.  New York law is clear: in order to prove that Viamedia is insolvent, and therefore that WOW! had a right to terminate the Agreement, WOW! must show more than a refusal to pay; it must show an inability to do so.

Second, even assuming, *arguendo*, that Viamedia's failure to pay WOW! suggested an inability to pay WOW! (which is definitively not the case), that inability, standing alone, cannot create insolvency as a matter of law.  In *In re Gordon Car and Truck Rental Inc.*, the court evaluated a licensing agreement that granted a party the right to unilaterally terminate the contract based on its counterparty's insolvency.  59 B.R. 956 (N.D.N.Y. 1985).  Like the Agreement in this case, the contract was silent as to the definition of "insolvency."  Accordingly, the court applied

"the common law meaning of insolvency," which required the court to determine whether the alleged insolvent party "was **unable** to pay its debts as they came due in the ordinary course of its business." *Id.* (emphasis added). Like WOW! does here, the creditor pointed to evidence that the debtor had failed to pay its debts to that one creditor. *Id.* The court explained:

> In review of the facts presently before the Court, it is clear Debtor has failed to pay its debt owed to AMC; however, the common law definition appears to require an inability to pay ones "*debts*" as they come due in the ordinary course of business. By its very terms, this test contemplates the failure of a debtor to pay more than one debt.

*Id.* The court rejected the argument that the debtor's failure to pay debts to one creditor is evidence that the debtor was unable to its debts as they become due. WOW! makes the same argument, and it should likewise be rejected.[9]

Simply put, Viamedia is able to pay its debts as they become due in the ordinary course of business, and its refusal to pay WOW! contested amounts with an arbitration underway does not suggest, let alone prove, otherwise. That is particularly true in light of the fact that, due to WOW!'s conduct and the parties' course of dealing since 2017, the revenue share payment for December 2019 and beyond has not yet come due in the ordinary course. As such, Viamedia is likely to succeed on its claim that WOW! wrongfully terminated the contract.

B.     At A Minimum, There Are Sufficiently Serious Questions Going To The Merits

Out of an abundance of caution, Viamedia notes that it need not definitively prove its solvency at this stage in the litigation. As detailed in Section III, the equities tip decidedly in

---

[9] WOW!'s Notice of Termination itself appears to acknowledge this fact, stating that Viamedia "made it clear that Viamedia is unable to pay its debts to others as those become due in the ordinary course of business." However, this is a naked assertion with no actual support whatsoever. Instead, Viamedia is timely paying all other contractual parties consistent with the respective courses of dealing, and no other contractual partner has initiated arbitration or declared material breach.

Viamedia's favor.  Accordingly, a TRO is appropriate if there is a "serious question" going to the merits.  In *Jacobson & Co., Inc. v. Armstrong, Cork Co.*, the Second Circuit affirmed an order enjoining a termination even though the plaintiff had not shown a likelihood of success on the merits.  548 F.2d 438 (2d Cir. 1977).  The court explained:

> On the record, it is questionable whether [plaintiff] has shown that it is likely to succeed on the merits at trial.  However, we think it is plain that plaintiff has sustained its burden of raising serious questions going to the merits which make them fair ground for litigation. The affidavits, depositions, and various exhibits raise at least the inference that [plaintiff] was [wrongfully] terminated…Although this issue cannot be finally decided until discovery is completed and the court has the benefit of a full factual presentation, [plaintiff] has satisfied [its burden to show serious questions].

Even if WOW! could come forward with more evidence than it provided to Viamedia on May 21, 2020, WOW! would not be able to demonstrate that there is not, at a minimum, a serious question regarding whether the termination was wrongful.  Instead, courts routinely identify serious questions as to the merits where there is significantly more evidence of insolvency than the naked allegations put forth by WOW!.  For example, in *Optima Media Grp. Ltd. v. Bloomberg*, the terminating party pointed to evidence that its counterparty was entirely unable to access capital in 2013 and 2014.  2018 WL 1587074 (S.D.N.Y. Mar. 28, 2018).  The court accepted *arguendo* that the terminating party had established insolvency in those years, but refused to dismiss the wrongful termination claim because the agreement was not terminated until 2015.  *Id.*  Even acting under the assumption that the party **had been insolvent a year earlier**, the court refused to grant a motion to dismiss a wrongful termination claim because the court could "not determine at this stage whether [plaintiff] was insolvent at the time of the termination."  *Id.*

C.     WOW! Has No Basis To Terminate For An Uncured Material Breach

As an "alternative" basis for termination, WOW! states that "as [WOW!] indicated by letter dated April 13, 2020, Viamedia is in Material Breach of the Agreement for failure to pay and this

25

letter serves as Notice of Termination under Section 6.1(a) of the Agreement."   Solomon Dec., ¶ 53, Exhibit J.  In reality, however, WOW! expressly disclaimed any intent for its April 13, 2020 letter to trigger the notice and cure provision of the Agreement.

On April 16, 2020, Viamedia expressed concerns to WOW! via teleconference that WOW!'s April 13, 2020 letter was intended to trigger certain cure and dispute resolution procedures.  The Interim CEO of WOW!, Bill Case, expressly stated during that call that it did not intend for the April 13, 2020 letter to be a formal notice of breach, and further that WOW! would not commence arbitration if Viamedia made a revenue share payment.  Based on that express representation, Viamedia wired WOW! $396,808.00 dollars that day.  *Id.*, ¶¶ 45-46.

On April 20, 2020, WOW! sent Viamedia another letter with the subject line "Payment Plan."   In that letter, WOW! referenced that "WOW! will continue to consider Viamedia in material breach of its payment obligations . . . unless and until Viamedia becomes current on all sums owed to WOW!"  Solomon Dec., ¶¶ 47-48.  This raised concerns for Viamedia, as it directly contradicted the representation four days earlier.  To avoid any confusion, Viamedia sent a letter to Bill Case that stated: "Unless WOW! informs us to the contrary, consistent with our conversation last Thursday, Viamedia will assume that Misty's statement in her April 20, 2020 letter was <u>not</u> intended by WOW! to serve as a formal notice of breach triggering the cure and dispute resolution procedures in the Advertising Agreement."  WOW! never informed Viamedia to the contrary.  *Id.*, ¶¶ 49-50.

Instead, on April 22, 2020, WOW! emailed Viamedia a Demand for Arbitration.  Solomon Dec., ¶ 51, Exhibit I.  That Demand for Arbitration makes two things clear: 1) WOW intends to arbitrate the dispute as to the amount of money Viamedia owes WOW! and the dates that such payments become due; and 2) WOW! wanted to insure that Viamedia to "be mindful of [its]

obligations under Section 5.3 of the Agreement to <u>continue to provide products and services without interruption</u>."  (Underline added.)

Thus, WOW! formally withdrew any Notice of Material Breach it may have issued when it accepted a $396,808.00 payment that was explicitly conditioned on the understanding that any Notice was withdrawn, and indicated via its own Demand for Arbitration that the foundational questions as to Viamedia's obligations must be arbitrated while the parties continue performing.

WOW! cannot invoke a termination right based on Viamedia's failure to cure a purported material breach because WOW! did not grant Viamedia the contractually required 30 days to cure. It is therefore unnecessary for Viamedia to establish, in this proceeding, that Viamedia has not materially breached the Agreement at all.  *See, e.g.*, *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989) (holding that a corporation's immediate termination of contract even though contract specified that production company would have 30 days in which to cure any defects was "ineffective" and breach of contract); *In re Best Payphones, Inc.*, 2007 WL 1388103, at *6 (Bankr. S.D.N.Y. May 8, 2007), *aff'd,* 432 B.R. 46 (S.D.N.Y. 2010), *aff'd,* 450 F. App'x 8 (2d Cir. 2011) ("[T]he termination is ineffective and the termination is itself a breach") (internal citation omitted).  For the avoidance of doubt, Viamedia is confident that it will establish in arbitration that the delayed payments under these circumstances are not material breaches under New York law.  *See, e.g., Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284 (2d Cir. 1987) (delay in performance not a material breach even when the delay causes measurable monetary damages); *PLanete Bleue Television Inc. v. AandE Television Networks, LLC*, 2018 WL 10579873 (S.D.N.Y. Sept. 19, 2018) (finding that a delayed payment was not material where it was brief and did not cause plaintiff any prejudice).

## II.     Viamedia Will Suffer Irreparable Harm Without A TRO

WOW!'s wrongful termination will cause irreparable harm to Viamedia.  In *Roso-Lino Beverage Distributors, Inc. v. The Coca-Cola Bottling Co. of NY,* the Second Circuit overturned the denial of a request for a preliminary injunction to preserve the status quo in light of Coca-Cola's termination of a distribution agreement.  749 F.2d 124 (2d Cir. 1984).  Like Viamedia's cable TV inventory distributorship agreement, the court found that "the loss of [the distributorship], an ongoing business representing many years of effort and the livelihood of [the] owners, constitutes irreparable harm."  *Id.*  "What plaintiffs stand to lose cannot be fully compensated by subsequent monetary damages."  *Id.* (citing cases).  "The Second Circuit has consistently held that a preliminary injunction may be granted on a behalf of a franchisee who is faced with a notice of default and/or termination by a franchisor."  *Progressive Restaurant Systems, Inc. v. Wendy's Intern., Inc.*, 1990 WL 106719, at *2 (N.D.N.Y. July 20, 1990) (citations omitted).

"The threat of bankruptcy or loss of a party's business, absent the granting of preliminary relief, constitutes an irreparable injury, for otherwise a final judgment might be useless."  *Id.*; *see also Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27 (2d Cir. 1995) (explaining that irreparable harm exists where "the very viability of the plaintiff's business, or substantially losses of sales beyond those of the terminated product, have been threatened") (citations omitted).

With its current 26 sales personnel in WOW!'s markets and 58 support personnel in Kentucky, Viamedia has made major investment over 18 years to support the sales and sales operations related to WOW! cable TV advertising inventory.  WOW!'s wrongful termination, as Viamedia's largest inventory supplier, is a threat to the very viability of Viamedia's business.  Solomon Dec., ¶¶ 56-64.  As the Second Circuit has explained on multiple occasions, "a threat to

the continued existence of a business can constitute irreparable injury." *Nemer Jeep-Eagle Inc. v. Jeep-Eagle Sales Corp.,* 992 F.2d 430 (2d Cir. 1993) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods.*, *Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1978)); *see also Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.,* 754 F. Supp. 2d 616 (S.D.N.Y. 2010) (finding irreparable harm and enjoining a termination that would negatively impact plaintiff's goodwill and reputation, "**possibly** resulting in a permanent loss of business" (emphasis added); *Five Star Development Resort Communities, LLC v. iStar RC Paradise Valley LLC,* 2010 WL 1005169 (S.D.N.Y. Mar. 18, 2010) ("This **threat** to [plaintiff's] ongoing financial viability can, in and of itself, satisfy the irreparable harm requirement.") (emphasis added); *Janmort Leasing, Inc. v. Econo-Car Intern., Inc.*, 475 F. Supp. 1282, 1294 (2d Cir. 1979) ("In this circuit it is firmly settled that the loss or destruction of a going business constitutes irreparable harm, whether viewed as an injury not compensable in monetary terms, or as one which cannot be reduced to monetary value with sufficient accuracy to make damages an adequate substitute for injunctive relief.") (citations omitted).

Moreover, WOW!'s termination would cause irreparable harm to Viamedia's reputation and cause ripple effects on Viamedia's other business endeavors. The cable television industry is a relatively small community with a limited number of major players, and Viamedia's relationship with WOW! is well-known to members of that community.[10] WOW!'s termination of the Agreement "due to Viamedia's insolvency" would deliver a false message to that community that Viamedia is unable to pay its debts as they become due in the ordinary course. Solomon Dec., ¶¶ 60-61. By the time that Viamedia prevails in arbitration, and demonstrates that WOW! was

---

[10] Viamedia believes that WOW! began speaking with Viamedia's competitors about replacing Viamedia and running WOW!'s cable TV advertising business before serving its Notice of Termination, and potentially before any dispute arose between Viamedia and WOW!

incorrect as to the amounts owed, incorrect as to the payment schedule, and entirely unjustified in its termination, the irreparable damage to Viamedia will already be done.

This severe damage to Viamedia's reputation and goodwill would constitute irreparable harm.  *See, e.g., Rex Medical,* 754 F. Supp. at 621 ("A company's 'loss of reputation, good will, and business opportunities' from a breach of contract can constitute irreparable harm.") (quoting *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir.2004)); *3M Company v. Performance Supply, LLC,* 2020 WL 2115070, at *8 ("In short, 3M should have its carefully curated brand and reputation left to the devices of the Defendant's scheme to profit from a pandemic.  Yet, this is exactly what will happen in the absence of a [preliminary injunction].  Accordingly, 3M has established irreparable harm.").

## III.   The Balance Of The Hardships Tip Decidedly In Viamedia's Favor

In *Roso-Lino*, the Second Circuit weighed equities similar to those at issue here in determining whether to enjoin a termination.  749 F.2d 124 at 126.  The court explained that it was "unlikely that [the defendant] would suffer greatly if the eleven-year relationship is continued for a short while," while the plaintiffs "stand to lose their business forever."  *Id.*  Accordingly, the court found that "the equities tip (rather heavily) in favor of granting a preliminary injunction."  *Id.*  Here, it is unlikely that WOW! will suffer greatly if its eighteen-year relationship with Viamedia continues for a short while longer.  WOW! has commenced arbitration and is pursuing its claims for damages against Viamedia.  A final award in the arbitration must be issued within sixty days of the appointment of the arbitrators, and Viamedia is awaiting WOW!'s response on a proposed arbitrator.

Similarly, in *Progressive Restaurant*, the defendants wrongfully terminated an agreement based on non-payment of franchise royalties.  1990 WL 106719.  After noting the existential harm

to plaintiff's business in the absence of an injunction, the court explained that the "defendants will not be able to show any prejudice or undue hardship as a result of continuing the franchise agreements pending the outcome of the litigation" because defendants "maintain [their] right to seek monetary damages for alleged nonpayment of franchise royalties."  *Id.; see also Nemer Jeep-Eagle*, 992 F.2d at 436 ("The balance of the equities in this case tips decidedly in favor of appellant being granted [equitable relief] because neither Eagle Sales nor the four new dealers will suffer harm proportionate to appellant's loss of business as a result of the status quo injunction.").  WOW! has commenced arbitration and can recover monetary damages from Viamedia if it prevails, and the small delay (approximately sixty days) until resolution does not offset the irreparable harm that Viamedia would suffer.

## IV.    A TRO Would Not Harm The Public Interest

Finally, granting Viamedia's requested injunction here would not harm the public interest as Viamedia is simply seeking to maintain the status quo by requesting the Court require WOW! to abide by its contractual obligations until the parties' dispute can be finally resolved by arbitration.  "In general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements." *Rex Medical L.P. v. Angiotech Pharmaceuticals (US) Inc.*, 754 F. Supp. 2d 616 (2010).   In *Rex,* the court held that the plaintiff was "likely to prevail on its claims that [defendant] may not unilaterally terminate the Agreement," and further held that the parties must arbitrate disputes arising out of the agreement. *Id.*  Therefore, the court explained, all "the Court is being asked to is to enforce the parties' bargained-for right to arbitrate any disputes that arise under the Agreement."  *Id.*  The court held that the injunction would not harm the public interest because the "public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense."  *Id.*.

31

Accordingly, the public interest is not harmed by equitable relief that maintains the status quo where a party attempts to wrongfully terminate the agreement. *Id.; In re Comp III, Inc.* 136 B.R. 636, 639 (S.D.N.Y.1992) (explicating the court's authority to reinstate terminated agreement if preliminary injunction standard is met); *see also Henry Schein*, 191 F. Supp. 3d at 1078 ("Similarly, the public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer.").

## **CONCLUSION**

Based on the foregoing, Viamedia respectfully requests: (a) that, pending a ruling on Viamedia's Motion For Preliminary Injunction, the Court enter an order temporarily reinstating the Agreement and restraining WOW! from terminating the Agreement; (b) that the Court enter an Order to Show Cause why a Preliminary Injunction should not issue continuing such injunctive relief during the pendency of that arbitration and this litigation; and (c) that following a hearing on the within and foregoing Motion For Preliminary Injunction, the Court continue to enjoin WOW! throughout the pendency of this action and until further order of this Court, from terminating the Agreement.

Dated: May 27, 2020

Respectfully submitted,

**K&L GATES LLP**

*/s/ Luke E. Steinberger*
Luke E. Steinberger
Kodey M. Haddox
599 Lexington Avenue
New York, New York 10022
Tel.: 212.536.3900
Fax: 212.536.3901
Luke.Steinberger@klgates.com
Kodey.Haddox@klgates.com

*Attorneys for Viamedia, Inc.*